UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-20703-CR-SCOLA/TORRES

UNITED STATES OF AMERICA

v.

EBONY NESBITT,

      Defendant.
_____/

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Ebony Nesbitt's ("Defendant" or "Ms. Nesbitt") motion to suppress statements protected under the Fifth Amendment against the United States of America (the "Government"). [D.E. 21]. The Government responded to Defendant's motion on February 15, 2019 [D.E. 26] to which Defendant replied on March 7, 2019. [D.E. 33]. Therefore, Defendant's motion is now ripe for disposition. After careful review of the motion, response, reply, relevant authorities, and with the benefit of an evidentiary hearing, Defendant's motion to suppress should be **DENIED**.[1]

### I.    BACKGROUND

In May 2017, members of the Federal Bureau of Investigation ("FBI") began investigating individuals who had received fraudulent income tax refunds in their bank accounts while they were students at Miami-Dade College. The investigation

---

[1] The Honorable Robert N. Scola referred Defendant's motion on January 28, 2019 to the undersigned Magistrate Judge for disposition. [D.E. 23].

1

revealed that on October 2, 2013, Ms. Nesbitt's Higher One bank account received a federal income tax refund in the amount of $7,573 in the name of "E.C.," who was deceased. Investigators from the Internal Revenue Service ("IRS") later determined that the tax return filed was fraudulent, causing the refund check to be deposited into Ms. Nesbitt's account. That same day, an ATM withdrawal was made from Ms. Nesbitt's bank account in the amount of $502. Higher One then closed Ms. Nesbitt's account and a check for the remaining balance of $7,068.50 was mailed to her home address.

Shortly thereafter, Ms. Nesbitt deposited the funds into her Navy bank account and withdrew monies as needed for her two children. At the time of the alleged theft, Ms. Nesbitt was a student at Miami-Dade College. Ms. Nesbitt became a Miami-Dade Police Officer in 2014 and took the Oath of Office on August 7, 2014. Ms. Nesbitt also serves in the United States Navy Reserve as a Master at Arms in the Military Police. In March 2018, Ms. Nesbitt was performing her reserve duties in Maryland when FBI Special Agents ("SA") Donald Morin and Andrew Mercurio coordinated with Supervisory Special Agent ("SSA") Joseph Brummen of the Naval Criminal Investigative Service ("NCIS") to interview Ms. Nesbitt. SSA Brummen requested that Ms. Nesbitt's superior direct Ms. Nesbitt to report to the NCIS Field Office in Washington, DC after her duty shift ended to update her background check paperwork.

On March 20, 2018, Ms. Nesbitt drove to the NCIS Washington, DC Field Office after being relieved from her dutues, where she met with SSA Brummen. SSA

Brummen then left, and Ms. Nesbitt and the FBI agents went to the victim/witness interview room for an interview. The agents explained that the reason for their visit was to speak with Ms. Nesbitt about a fraudulent income tax refund deposited in her Higher One bank account when Ms. Nesbitt was a student at Miami-Dade College. Ms. Nesbitt asked if she needed an attorney present and the agents responded that it was her right to have an attorney but that it was unnecessary because she was not under arrest.

The agents showed Ms. Nesbitt her Higher One bank statement and an endorsed check that Ms. Nesbitt deposited into her Navy bank account. The agents explained that the tax return Ms. Nesbitt allowed her ex-boyfriend, Mr. Morales, to make was fraudulent. At the end of their presentation, the agents told Ms. Nesbitt that she needed to decide how she wanted to proceed. Plaintiff alleges that the agents stated that it would be in her best interests to cooperate so that there would be no need to inform her superiors in the United States Navy or Miami-Dade Police Department ("MDPD") of these events.

Specifically, the agents explained to Ms. Nesbitt the benefits of accepting responsibility, and that it could be favorable for her at sentencing to the extent the Government prosecutes her for the fraudulent scheme. Ms. Nesbitt then made several incriminating statements where she admitted to receiving the money in her Higher One bank account on behalf of Mr. Morales. Ms. Nesbitt also admitted that she knew the money was fraudulently obtained and provided the identities of others involved in the scheme. Ms. Nesbitt acknowledged that she gave $5,000 to Mr.

Morales and used the remaining $2,000 to furnish her apartment and pay student loans. Ms. Nesbitt made notations on the copy of the Higher One bank statement and the photocopy of the endorsed Higher One check.

Special Agent Mercurio wrote Ms. Nesbitt's statement, which she then reviewed and made corrections before signing. When Ms. Nesbitt made corrections to the written statement, she initialed where she had made the corrections. Ms. Nesbitt then initialed each page indicating that she had reviewed it. The first paragraph states that she cooperated with the FBI, and that no promises were made to her in return. It also states that Ms. Nesbitt hoped that her cooperation and acceptance of responsibility would be taken into consideration at the conclusion of her case. The last paragraph of the statement indicates that (1) Ms. Nesbitt would contact the FBI with any new information, (2) that she voluntarily cooperated with the agents, and (3) that she was willing to pay back the funds she obtained from the fraudulent scheme.

The interview lasted at least ninety minutes, and, at the conclusion of the meeting, the FBI agents and Ms. Nesbitt left the interview room. The FBI agents then provided Ms. Nesbitt with their business cards, and Ms. Nesbitt called Special Agent Morin approximately two days later reaffirming her desire to cooperate. Ms. Nesbitt returned from her Navy Reserve Duty on approximately April 6, 2018 and continued working for the Miami-Dade Police Department. A federal Grand Jury later returned an indictment against Ms. Nesbitt on August 23, 2018, charging her with conspiracy, in violation of Title 18, United States Code, Section 371, and one

count of theft of government money, in violation of Title 18, United States Code, Section 641.  Ms. Nesbitt has now filed a motion to suppress the statements made to the FBI agents on March 20, 2018, alleging that her statements were unlawfully compelled under *Garrity v. New Jersey*, 385 U.S. 493 (1967).  Alternatively, Plaintiff claims, that even if *Garrity* does not apply, her statements must be suppressed as a violation of her *Miranda* rights.

## II.     ANALYSIS

### A.     *Whether Defendant's Statements are Protected under Garrity*

Ms. Nesbitt's initial argument is that her statements should be suppressed because she was coerced into making involuntarily remarks after two FBI agents threatened to inform her employers – the MDPD and the United States Navy – of her potential involvement in a fraudulent scheme.  In doing so, Ms. Nesbitt claims that the agents violated the U.S. Supreme Court's decision in *Garrity* that protects police officers, and other public officials, from the choice of self-incrimination or job forfeiture.  Fearing for the loss of her employment and the ability to care for her two children, Defendant states that she agreed to anything the agents requested.  Ms. Nesbitt asserts, for example, that the agents prepared her statement and that – while she may have corrected certain portions of it – she would have ultimately agreed to anything if they demanded something in exchange for continued employment.  Because the agents coerced Ms. Nesbitt into providing self-incriminating statements in exchange for continued employment, Ms. Nesbitt concludes that the agents violated *Garrity* and that her remarks must be suppressed.

In *Garrity*, the U.S. Supreme Court held that where a statement is obtained from a police officer "under threat of removal from office," that statement cannot then be used in a subsequent criminal proceeding. *Garrity*, 385 U.S. at 499. The Government contends that the agents never communicated any threat, nor did they inform Defendant that her employers would be informed of their conversations. Instead, the Government argues that Ms. Nesbitt was questioned in Washington, DC, well away from the MDPD, and that no officials from the MDPD or the Navy were present during the interview.

In fact, the Government maintains that the agents had no power to terminate or alter Ms. Nesbitt's job status. And with respect to Ms. Nesbitt's contention that the agents were in possession of her personnel files during the interview as a way to coerce her cooperation, the agents testified that this was the case. At most, the agents stated that there was a single document – without a Miami Dade emblem as Defendant alleges – that included Defendant's family members. Because there was no threat to Defendant's employment in any way nor the presence of any personnel files to coerce Ms. Nesbitt, the Government concludes that Ms. Nesbitt's motion to suppress must be denied.

We begin our analysis with the principle that the Fifth Amendment's protection against self-incrimination is not self-executing. This means that a witness's answers "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of privilege." *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984). That is, "if a witness under compulsion to testify

6

makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." Id. (quoting Garner v. United States, 424 U.S. 648, 654 (1976)). An exception to this rule arises when assertion of the Fifth Amendment privilege "is penalized so as to foreclose a free choice to remain silent and compel incriminating testimony." Id. at 434 (internal citation and punctuation omitted). Therefore, the Fifth Amendment permits a witness to refuse to answer any question put to him "unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." Lefkowitz v. Turley, 414 U.S. 70, 78 (1973) (citing Kastigar v. United States, 406 U.S. 441 (1972)). This protection extends to any "proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Murphy*, 465 U.S. at 426 (quoting Turley, 414 U.S. at 77).

Here, Defendant testified that she felt coerced into giving incriminating statements because the Government informed her that she if refused to cooperate, her superiors would be notified. This means that – by Defendant's own admission – the agents did not explicitly threaten Defendant with the loss of her two jobs. The Government suggests that this leaves Defendant with nothing more than the two-prong test that the Eleventh Circuit set forth in *United States v. Vangates*, 287 F.3d 1315, 1320 (11th Cir. 2002), because this is a case with no direct threat of termination. Ms. Nesbitt argues, on the other hand, that the Government is incorrect because the Eleventh Circuit has stated that "a public employee may not be coerced

into surrendering his Fifth Amendment privilege by threat of being fired or *subjected to other sanctions.*" *Vangates*, 287 F.3d at 1320 (emphasis added) (citing Erwin v. Price, 778 F.2d 668, 669 (11th Cir.1985)). While the Eleventh Circuit has not precisely defined the meaning of "other sanctions," Ms. Nesbitt insists that the facts of this case fit that criteria and that her statements should be suppressed accordingly.

Ms. Nesbitt's reliance on the "other sanctions" language is unpersuasive because – while the Eleventh Circuit has not provided an exact definition of these terms – the U.S. Supreme Court has offered guidance on its meaning. For example, in *Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) – the case that the Eleventh Circuit relied upon in *Vangates* – the "other sanction" that the Supreme Court found serious enough to compel testimony was a statute which removed a political party officer from his position and barred him from holding any other party or public office for five years because he refused to waive his privilege against self-incrimination. *See Cunningham*, 431 U.S. at 802. The statute assured an individual that he would lose his political position – which is akin to employment – if he did not waive his Fifth Amendment Rights.

While this is not necessarily a precise definition, it means that the "other sanctions" language does not arise to conduct short of termination. Ms. Nesbitt reaches a different conclusion but relies on no persuasive authority for her position, while district courts in our circuit have suggested otherwise. *See, e.g.*, *United States v. Hill*, 2010 WL 234798, at *6 n.3 (N.D. Ga. Jan. 13, 2010) ("[T]he 'other sanctions' language that made its way from *Cunningham* to *Erwin* to *Vangates*, does not

8

establish that sanctions short of termination may be sufficient for *Garrity* immunity in the case of a public employee."). Even if we agreed with Ms. Nesbitt that the conduct of the FBI agents met the "other sanctions" language, her argument possesses another flaw in that there was no guarantee that she would lose her job if the officers informed her employers of their conversations. Ms. Nesbitt, of course, makes that assumption but the form of discipline that she may have received if her employers were told of the conversations with the FBI equates to a mere possibility. Indeed, Ms. Nesbitt testified that the FBI agents threatened to inform her employers – not that she would have been terminated for failing to cooperate. That is a material distinction because "where there is no direct threat, the mere possibility of future discipline is not enough to trigger Garrity protection." *United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016). Because Ms. Nesbitt's argument fails for two independents reasons, we must consider whether the two-part test for cases with no direct threats of termination is applicable to the facts presented.

In cases with no direct threat of termination, the Eleventh Circuit uses a two-prong test: (1) a defendant must have subjectively believed that she was compelled to give the statement, and (2) this belief must have been objectively reasonable at the time the statement was made. *Vangates*, 287 F.3d 1315. As to the first prong, Ms. Nesbitt asserts that she continued to participate with the FBI's questioning because she could only make one of two choices: either "make a statement or lose both her position as police officer and her job in the US Navy." [D.E. 21 at 4]. However, Ms. Nesbitt's subjective belief is unsupported with the evidence in the record. Ms. Nesbitt

9

has been a Miami-Dade Police Officer since August 2014, and as such, she is familiar with the MDPD's disciplinary procedures and the Officer's Bill of Rights. To that end, Ms. Nesbitt could not have subjectively believed that she was forced to make a statement because on at least one occasion prior to the FBI interview on March 20, 2018, Ms. Nesbitt was the subject of internal discipline with Internal Affairs, and she was familiar with the procedures used. Moreover, Ms. Nesbitt reviewed and edited the written statement that the agents prepared. The first paragraph, for example, establishes that Ms. Nesbitt cooperated with the FBI in the hopes that it be taken into consideration at the conclusion of her case. Then, in the final paragraph, Ms. Nesbitt reaffirmed her statement that she voluntarily cooperated with the agents and that no promises were made in return for her commitment. Based on Ms. Nesbitt's history with her employers, her knowledge of the disciplinary procedures, and her voluntary cooperation with the FBI, Ms. Nesbitt could not have subjectively believed that her employment positions were at risk if she refused to cooperate with the agents.

Ms. Nesbitt's claim also fails the second prong because it was not objectively reasonable for her to believe that the agents compelled her to give a statement at the time of her interview. First, Ms. Nesbitt was familiar with the process of internal investigations of the MDPD and she signed a written statement indicating that her cooperation was voluntary. Second, no one from the Navy or the MDPD was present for the interview. Third, Ms. Nesbitt's review of the written statement – particularly the section where she hoped the Court would take her cooperation into consideration

at the conclusion of her case – shows that Ms. Nesbitt knew she was going to be prosecuted and was hoping to proactively cooperate for consideration at her sentencing. Fourth, Ms. Nesbitt contacted the agents two days later to continue her cooperation. And fifth, the FBI expended time and resources so that Ms. Nesbitt's colleagues were unaware that she may have participated in a fraudulent scheme.

In sum, all of the facts presented demonstrate that it was objectively unreasonable to believe that the agents compelled Ms. Nesbitt's statements. If we adopted Ms. Nesbitt's position, any potential investigation could have adverse effects on an officer's employment status and there would be no circumstance available to law enforcement to interview a police officer about potential criminal wrongdoing. This is not the holding in *Garrity* or its progeny. Therefore, Ms. Nesbitt's motion to suppress her statements as a violation of *Garrity* should be **DENIED**.

### B.     *Whether the Agents Violated Defendant's Miranda Rights*

Alternatively, Ms. Nesbitt argues that her statements should be suppressed because the agents failed to give her any *Miranda* warnings before she provided several incriminating statements. Ms. Nesbitt claims, for example, that her superiors in the United States Navy directed her to attend the interview with the agents and that the agents interrogated her for at least ninety minutes. Ms. Nesbitt also questioned the agents if she needed an attorney present and they responded that one was unnecessary at the time. Because Ms. Nesbitt was compelled to attend the interview and inquired about whether she needed an attorney, Ms. Nesbitt concludes that her statements should be suppressed because the agents had an obligation to

provide her with *Miranda* warnings and to cease questioning until she acquired counsel.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Miranda v. Arizona, 384 U.S. 436 (1996), "established that custodial interrogation of a suspect cannot occur before a suspect is warned of his or her rights against self-incrimination." United States v. Newsome, 475 F.3d 122, 1224 (11th Cir. 2007). These rights include: (1) the right to remain silent, (2) the right that statements can and will be used against them in a court of law, (3) the right to an attorney during questioning, and (4) the right that an individual cannot afford an attorney, one will be appointed. *See id.* However, before *Miranda* warnings are required, a defendant must be in custody and under interrogation. *See United States v. Herron*, 2015 WL 867309, at *16 (M.D. Fla. Feb. 4, 2015) (citing United States v. Castro, 723 F.2d 1527, 1530 (11th Cir. 1984)).

"Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. A person is "in custody" for purposes of Miranda when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted). Whether a person is "in custody" is a mixed question of law and fact, and "depends on whether under the totality of the circumstances, a reasonable man in his

position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001). The test is objective and viewed from the perspective of a reasonable innocent person. *See United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). Factors include whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and duration of the interaction. *See United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010).

Here, *Miranda* is inapplicable because there is no evidence in the record that Defendant was in custody. Defendant was not under arrest nor was Defendant handcuffed at any time during her interview with the FBI agents. The agents also never displayed their weapons or handcuffs, and the meeting took place in the victim/witness interview room as opposed to a custody room. Moreover, the agents testified credibly that Defendant was not under arrest and that she was merely one individual as a target of their investigation. While Ms. Nesbitt suggests that a target of an investigation may necessitate *Miranda* warnings, the U.S. Supreme Court foreclosed that argument long ago. See United States v. Manor, 936 F.2d 1238, 1241 (11th Cir. 1991) ("The Supreme Court has clearly stated that *Miranda* is not implicated simply because an individual is the subject or target of an investigation.") (citing Murphy, 465 U.S. at 431). In fact, the Supreme Court has stated that "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to

13

come and go until the police decide to make an arrest." *Stansbury v. California*, 511 U.S. 318, 325 (1994). Because the custody prong has not been met, Defendant's motion to suppress her statements as a violation of *Miranda* should be **DENIED**.

Putting aside that problem, Defendant claims that the agents should have ceased questioning because she inquired as to whether she needed an attorney.[2] It is certainly true that if, during a custodial interrogation, a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. 436, 473–74. Defendant's argument lacks merit, however, because "[l]aw enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous." *Medina v. Singletary*, 59 F.3d 1095, 1100–01 (11th Cir. 1995) (citation omitted).

In this case, Defendant merely questioned the agents as to whether she needed counsel and the agents responded that it was unnecessary but that she could have one if she decided to do so. Defendant's request does not implicate *Miranda* because "[a] suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Coleman v. Singletary,* 30 F.3d 1420, 1424 (11th Cir. 1994). Defendant's inquiry – as she framed it herself during the evidentiary hearing – was neither unambiguous nor an affirmative request for

---

[2] Defendant's argument assumes that there is a custodial interrogation. While the record makes clear that there was no custodial interrogation in this case, we consider Ms. Nesbitt's argument nonetheless.

counsel. This means that, while Defendant may have asked the agents whether she needed an attorney, that inquiry falls short of an affirmative representation that the agents cease questioning until Defendant's attorney is present. For these reasons, Defendant's motion to suppress her statements as a violation of *Miranda* should be **DENIED**.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's motion to suppress [D.E. 21] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 12th day of March, 2019.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge